## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,  (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,  (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |
| REMBRANDT 3D HOLDING LTD,<br><br>    Plaintiff<br><br>vs.<br><br>SHADRON L. STASTNEY, SLS Holdings VI, LLC, HAWK INVESTMENT HOLDINGS, LTD., SEECUBIC, INC.and SEECUBIC, B.V.,<br><br>    Defendants. | Adv. Pro. No. 24-00142 |

## AMENDED ADVERSARY COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Rembrandt 3D Holding Ltd. ("Rembrandt"), by and through undersigned counsel, and pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") hereby file this amended complaint (the "Complaint") seeking an injunction against defendants Shadron L. Stastney ("Stastney"), SLS Holdings VI, LLC ("SLS"), Hawk Investment Holdings, Ltd. ("Hawk"), SeeCubic, Inc. ("SCI") and SeeCubic, B.V. ("SCBV," collectively, the "Defendants" or "Buyer") and for a Declaratory Judgment by This Court declaring that Rembrandt property was not sold and requiring that any Rembrandt property in the Debtor's prior assets be

removed by the Buyer from the property transferred during the Sale.  In support of this Complaint, the Plaintiff hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an adversary proceeding for a Declaratory Judgment requiring removal of any Rembrandt property from the Debtors' former assets transferred during the a 363 sale (the "Sale") pursuant to the Order (A) Approving The Sale of Substantially All of The Debtors' assets Free And Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing The Trustee to Enter into and Perform Debtors' Obligations Under The Asset Purchase Agreement, (C) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief, a sale order dated December 9, 2024. ("Sale Order" Bankr. No. 23-10763, DI 876).

2.      The Sale Order specifically excluded "(j) any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction; (k) any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;" (Bankr. No. 23-10763, DI 876 at page 53).

3.      Rembrandt and the Debtors have reached a settlement that was approved in the "Order Granting in part, Denying in part as to the request for approval of the Settlement Agreement pursuant to Fed. R. Bankr. P. 9019; and Denying Motion to all other requested relief." (Bankr. No.

23-10763at DI 1137.)

4.      However, finalization of such settlement is dependent on the occurrence of the "Effective Date" (Bankr. No. 23-10763, DI 1040, Ex. F at 4) which requires an indemnification judgment against SeeCubic which has not occurred and the activities of the Defendants continue to increase likely costs to the Debtors and impeded the settlement with Rembrandt.

5.      Rembrandt has proven beyond any doubt that it is the owner of the intellectual property and that its intellectual property is embedded in the Debtors' technology ("UltraD"). Rembrandt licensed Stream and Stream was authorized to use in a manner permitted by the Rembrandt license, but Stream does not own the intellectual property.

6.      It is black letter law that the trustee cannot sell property not owned by the Debtors. The intellectual property licensed is owned by Rembrandt.  Debtor is merely a licensee of the Rembrandt intellectual property-not the owner and has no right or power to transfer Rembrandt's intellectual property.

7.      Stream had a license that allowed it to put Rembrandt technology into the possession of other parties for the purpose of having products made for Stream and SeeCubic, B.V. has possession of Rembrandt's technology for the sole licensed use of providing products to Stream.

8.      Stream was not authorized to allow SCBV to use Rembrandt's technology for third parties and once SCBV is no longer providing product to Stream, it must relinquish possession of Rembrandt's intellectual property.

9.      Without a license, SeeCubic, B.V. cannot legally possess or use the Rembrandt IP.

10.      SeeCubic, B.V. has an affirmative legal duty to remove Rembrandt's property once it was sold and no longer providing products to Stream.  Rembrandt put Buyers on notice of its

intellectual property rights and the Buyers knew that they did not acquire rights to Rembrandt's trade secrets in the possession of at least SeeCubic B.V. yet proceeded to an inappropriately take possession of Rembrandt's trade secrets and continue to use those trade secrets despite not having a license from Rembrandt.

## JURISDICTION AND VENUE

11.     This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001. This Court has jurisdiction over the claims raised in this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

12.     This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b).

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The Defendants cannot assert sovereign immunity in this adversary proceeding. Section 106(a)(1) of the Bankruptcy Code provides that "sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to . . . Sections 105 . . . 362 . . . of this title", and section 101(27) defines "governmental unit" to include "a foreign state" and a "foreign . . . government." 11 U.S.C. §§ 101(27), 106(a)(1).

15.     This Court has jurisdiction based on diversity pursuant to 28 U.S.C. 1332 whereas plaintiff is a Nevis corporation, Shadron L. Stasteny is a resident of New Jersey, SCI and SLS are a Delaware corporation and limited liability company, Hawk is a UK corporation, and SCBV is organized under the laws of the Netherlands and damages exceed $75,000.

16.     This Court has personal jurisdiction over Shadron L. Stastney, SCI, SLS, Hawk, and SCBV as each have done business in within the Eastern District of Pennsylvania and specifically imported into the United States prototypes that were made by SCBV and used by

Shadron L Stastney and other representatives of SCI, SCBV, SLS, and Hawk to show the prototypes to the Trustee within the Eastern District of Pennsylvania.

## PARTIES

17.     Plaintiff is a corporation organized and existing under the laws of the Island of Nevis with a registered address at Suites 5&6 Horsfords Business Centre, Long Point Road, Nevis, West Indies. Plaintiff is the owner of all of the assets of 3D Fusion Corp. ("3D Fusion"), a Delaware corporation formed on March 26, 2007 with its principal office at 110 Wall Street in New York City and its wholly owned Dutch subsidiaries 3D Fusion Holding B.V. ("3D Fusion Holding") and 3D Fusion EU B.V. ("3D Fusion EU") in Eindhoven, Netherlands.

18.     Defendant William A. Homony is the chapter 11 Trustee for the Debtors' estate. Stream, Mathu Rajan, and Raja Rajan were defendants in litigation brought by the Rembrandt in the Southern District of New York. (Exhibit 1.)  The litigation resolved through a settlement agreement that licensed Rembrandt's intellectual property to Stream (Exhibit 2), which included the trade secrets, patent, and trademarks owned by Rembrandt.  The trade secret categories licensed to Stream are listed in Schedule A in the license agreement. (Exhibit 2.)  Upon information and belief, Rembrandt's intellectual property that was licensed to Stream and was provided to Stream's downstream subsidiary, SCBV.  SCBV only had rights to manufacture and/or distribute the Steam product for benefit of Stream and Rembrandt pursuant to the license agreement between Stream and Rembrandt. (Exhibit 2.)  The 3D no glasses technology is owned by Rembrandt and is the intellectual property subject matter of this Complaint, to which SCBV has no right to transfer or to use outside of Stream's control and the actions of Stastney, SLS, Hawk, SCI, and SCBV to transfer and continue to use Rembrandt's intellectual property after the 363 sale constitute a knowing misappropriations of Rembrandt's trade secrets .

19.     Upon information and belief, defendant Stastney is the managing member of SLS, Chief Executive Officer of SCI, and sole director of SCBV and a resident of New Jersey.

20.     Upon information and belief, Defendant SLS is an entity formed under the laws of state of Delaware. Upon information and belief, SLS was Steam's senior secured creditor with $6,000,000 in secured senior notes. SLS purports to have transferred its notes to SCI.

21.     Upon information and belief, Defendant Hawk is an entity formed under the laws of Guernsey of the United Kingdom Channel Islands. Upon information and belief, Hawk is Steam's junior secured creditor, through eighteen (18) convertible promissory notes totaling approximately £50,600,000 British Pounds, €183,601 euros, and USD $1,152,757 in principal amount. Hawk purports to have transferred its Stream debt to SCI.

22.     Upon information and belief, Defendant SCI is a Delaware corporation with offices at 667 Madison Avenue, New York, NY, United States, 10055. Per SCI's own filings in the Delaware Court of Chancery, SCI is in control of an investment originally made by SLS in Stream and has both threatened to misappropriate Plaintiff's trade secrets and has actually misappropriated Plaintiff's technology. (No. 2020-0766-JTL – In Re Stream TV Networks, Inc. Omnibus Agreement Litigation.) For a review of the previous Delaware Omnibus litigation please see Vice Chancellor Laster's opinion "Factual Background." (Exhibit 3.) Upon information and belief, Defendant SCI was formed by Stastney and non-defendant Arthur Leonard Robert Morton ("Morton"). Upon information and belief, Stastney and Morton created SCI to serve as a vehicle to receive Stream's assets seized through an order which was originally issued by the Chancery Court in 2020 but later vacated and reversed by the Delaware Supreme Court in 2022.

23.     Upon information and belief, Defendant SCBV is a limited liability company formed under the laws of the Netherlands to conduct research and development activities for the

benefit of the Debtors.  SCBV was ultimately 100% owned by the Debtors, however, SeeCubic acquired title to SCBV through the 363 sale.

### THE REMBRANDT TECHNOLOGY AND STREAM TV NETWORKS

24.     Rembrandt is the owner and developer of multiple patents and trade secrets which comprise the 3D no glasses technology discovered by its C.E.O. Mr. Stephen Blumenthal. Blumenthal's discoveries came while working with his licensed Royal Philips WOWvx 3D hardware and software tools in the design of his 3D Auto Stereoscopic Display (3DASD) LCD technology platform.

25.     Stream came to Rembrandt's predecessor, 3DFusion, as an investor in 2010 and the relationship became adversarial when Rembrandt filed suit against Stream in the Southern District of New York Court in 2017.  After four years of litigation, Rembrandt's lawsuit against Stream was resolved in their signing a May 23, 2021 Settlement Agreement (Ex. 2).

26.     Stream developed a WOWvx, 2D Plus Depth 3D, no glasses LCD 3DTV based on licensing rights from both the Royal Philips company of the Netherlands and Rembrandt 3D Holding Ltd.  It is the Rembrandt trade secret technology licensed to Stream and branded as the Ultra-D 3DTV, that Stastney, SLS, Hawk, and SCI have misappropriated through a 363 sale to purchase the assets of Technovative which includes SCBV, an entity in possession of Rembrandt's intellectual property.

27.     The Rembrandt trade secrets range from the repurposing of Philips' software tools resulting in massive 3D image correction and optimization opportunities, to the utilization of a Philips optical lens array in a manner not envisioned by Philips and consequently when coupled with other trade secret improvements to the Philips WOWvx 3DASD platform, new heights in operational and performance standards are achieved.

28.     Hawk and Stream were engaged in litigation in the Delaware Court of Chancery, (No. 2022-0930-JTL – Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.) in Hawk's effort to gain control of Technovative. Hawk has publicly stated that if it gains control of Technovative and Rembrandt's 3D trade secret property, Hawk intends to sell the intellectual property held by Technovative which includes the Rembrandt trade secrets. (Exhibit 4 at ¶¶ 22, 86, The Hawk Complaint) ("Thereafter, Hawk may 'sell, lease or otherwise dispose of the Collateral in whole or in part, at public or private sale, on or off the premises of [Stream],' including pursuant to an Article 9 Sale.".)

29.     Indeed, by Hawk's own admission in its court filings, Hawk has already begun the process of seeking sale of Rembrandt's trade secrets and products that when used would be covered by Rembrandt patents:

> *On October 10, 2022, Hawk formally engaged SSG Advisors, LLC ("SSG") to act as investment banker in connection with the Article 9 Sale. SSG commenced an analysis of Stream's business and affairs related to the Collateral from publicly available information or other information in Hawk's possession as a result of its past relationships with Stream. (Exhibit 4 at ¶ 55.)*

30.     Stastney, SLS, SCI and Hawk had prior knowledge of the trade secrets being misappropriated.

31.     Stastney was active as a representative for Stream in the settlement negotiations on April 9, 2019 and he signed the Rembrandt Stream April 12, 2019 Settlement Term Sheet Agreement between Stream and Rembrandt (Exhibit 5).  The Rembrandt Stream April 9, 2019 Settlement Term Sheet Agreement included a list of Rembrandt's trade secrets and Stastney was fully aware of Rembrandt's ownership of the trade secrets.  The former Stream C.F.O., Shadron Stastney, formed SCI and acquired rights of the former investors and creditors of Stream.  SCI sought to gain control of Stream's assets and an Omnibus Agreement was executed that purported

to transfer Stream's assets to SCI, but litigation was commenced in the Delaware Chancery Court and the Omnibus Agreement was later held to be invalid (No. 2020-0766-JTL – In Re Stream TV Networks, Inc. Omnibus Agreement Litigation).

32. Upon information and belief, SCBV as subsidiary of Stream had and has access to Rembrandt intellectual property that was licensed to Stream. The Rembrandt license granted to Stream states: "Either Party may sub-license their rights to other parties for the purpose of having products distributed by the Party." but no other sub-licensing is permitted. (See Exhibit 2 at ¶ 14.)

33. Stastney, SLS, SCI, and Hawk do not have any license indirectly or directly from Rembrandt. Stastney, SLS, SCI, and Hawk are not entitled to transfer, convey, sell, dispose, or use the Rembrandt technology without a license.

34. SCBV is not entitled to possess, and certainly not use or disclose any of Rembrandt's trade secrets to any entity other than Stream.

35. Stastney stated, "Since the Court entered the Order Granting Preliminary Injunction on December 8, 2020, SCI has raised and deployed in excess of $10 million in order to further develop the glasses-free 3-D technology first started by Stream." (Exhibit 6)

36. SCI has also demonstrated Rembrandt's technology at trade shows, representing that Rembrandt's technology is its own. (See Exhibits. 7 & 8)  Further, SCI provided a TV incorporating Plaintiff's patents and trade secrets to multiple entities, including one in Dubai (See Exhibit 9), and upon information and belief, to an entity in Korea.

37. SCI has misrepresented and falsely stated that it owns and had the rights to Rembrandt's intellectual property. Moreover, Plaintiff alleges that SCI and SCBV have been on notice since SCI's Chief Executive Officer and SCBV's sole director is Stastney, who was Stream's previous Chief Financial Officer and Director and had signed the April 9, 2019

Settlement Agreement with Rembrandt. It was in that capacity as Stream's Director and CFO that Stastney was authorized to represent Stream during the Southern District of New York's mediation proceedings ordered by Judge Abrams and instituted because of Stream's breach of its contractual obligations to 3DFusion (and as successor in interest, Rembrandt) related to the 3D trade secret technology.

38.     During those proceedings, Stastney had personal knowledge and played a key role in the negotiations and executed the Rembrandt 3D Settlement Term Sheet, during the mediation. This document was signed by all parties including Magistrate Parker on April 9, 2019, and is unequivocal proof of Stastney's comprehensive knowledge of the Rembrandt ownership rights, which he was obligated to disclose to his investors, customers and the courts. These documents support Plaintiff's allegation that Stastney knew about Rembrandt ownership rights while authorizing SCI's development and commercial markets expansion,

39.     Following the Settlement Term Sheet Agreement of April 9, 2019 signing, Stastney and Stream Board Member Mr. Mark Coleman initiated a private mediation follow-up conference to discuss extending the payment runway of the terms in the Settlement Agreement with the intent of maintaining the net present value of the settlement. A private meeting with counsel was held in July, 2019 resulting in an 'Extension' document being drafted. This document was never signed due to the removal of Mark Coleman and Leo Hindery Jr., Stream's board of directors. Negotiations ceased thereafter.

40.     Upon information and belief, both of those directors, Mr. Coleman and Mr. Hindery Jr., are currently directors on the SCI board, and as of at least 2019, were well aware of Rembrandt's ownership of the intellectual property at issue.

41.     This Settlement Term Sheet Agreement of April 9, 2019 and the Definitive

Settlement Agreement of May 23, 2021, which was signed by both Mathu and Raja Rajan as representative Officers of Stream and for themselves as individuals, provide a list of intellectual property licensed to Stream and specifically recites the trade secrets that are owned by Rembrandt and licensed to Stream. Each of these trade secrets is included in the products and technology that SCI, SLS, Hawk, and SCBV are attempting to transfer without an assignment of the license from Rembrandt to Stream or a direct license from Rembrandt.

42.     These two Settlement Agreement documents are both clearly affirming market valuation of the Rembrandt's ownership rights which were licensed for $5.8 million, and hundreds of millions in future profits, plus two million in warrants and other considerations. These substantial compensations were all agreed to in exchange for Rembrandt licensing rights as per the Settlement Agreement documents, signed by Stastney and the Rajans. There can be no dispute that Stastney knew that he was trampling on Rembrandt's ownership rights by authorizing SCI's developmental and worldwide commercial market penetration expansion.

43.     Shad Stastney, SCI's CEO, signed the initial Settlement Term Agreement on April 9, 2019 more than one year prior to the Omnibus Agreement, which confirms that Stastney knew at the time of the signing of the Omnibus Agreement that Stream did not own the 3D no glasses technology, but merely had a license from Rembrandt. (Exhibit 5.)

44.     Upon information and belief, Stastney understood that Stream needed a license because the 3DFusion/Rembrandt technology was as foundational to their platform as was the Philips WOWvx License.

45.     Stastney had also ascertained the value of Rembrandt's technology, and agreed to a settlement and license payment that was identical to final license terms. Stream agreed to pay Rembrandt $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no

charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost for a total value of between $368,207,000 and $1,212,407,000. (Exhibit 2.)

46.     Stastney, thus, has been on notice since at least April 9, 2019 that subsequent efforts to develop and commercialize the technology by SCI, SCBV, SLS and Hawk without a license is unlawful, and a misappropriation of Rembrandt's trade secrets.

47.     Further actions demonstrating SCI's willful disregard of Rembrandt's rights are found in the published court proceedings, post the Omnibus Agreement, in which SCI states that their business is developing new products based on Stream's (Rembrandt) technology and that the company has been turned around, and as the court notes is now 'robust'. (Exhibit 6 at 2-3.) ("*Since the Court entered the Order Granting Preliminary Injunction on December 8, 2020 (Dkt. 111, the 'PI Order'), SeeCubic is thriving and has raised and deployed an excess of $10 million in order to further develop the glasses-free 3-D technology first started by Stream. SeeCubic has purchased millions of dollars of equipment and inventory, doubled the size of its staff by (among other things) bringing back all the key members of the Ultra-D founding team from the Netherlands, who had left Stream when the Rajans were exercising control. SeeCubic has also reduced its debt by over 50%, and it is not in default on any debt.*" (internal quotations omitted)).

48.     Thet the "*key members of the Ultra-D founding team from the Netherlands*" are the group of employees and engineers that had been working with 3D Fusion (predecessor to Rembrandt) back in 2010.

**BACKGROUND OF REMBRANDT'S OWNERSHIP OF ITS TECHNOLOGY**

49.     Plaintiff Rembrandt is the successor-in-interest to 3DFusion, the original creator of the patents and trade secrets comprising the improved Philip's 3DASD technology (or glasses-free 3D autostereoscopic display technology).  The relevant US patents include U.S. Patent Nos.

8,558,830, 9,681,114, and 9,521,390 (hereinafter, the '830, '114, and '390, patents, respectively). (Exhibits. 10-12.)

50.     In February 2016, Mr. Stephen Blumenthal acquired all of the assets of 3DFusion, including the above-referenced patents and trade secrets comprising the 3D no glasses technology.

51.     In December 2016, Mr. Blumenthal assigned all of 3DFusion's assets to Plaintiff.

52.     Mr. Blumenthal owns 100% of the outstanding shares of Rembrandt and is the Chief Executive Officer.

53.     He is also the majority shareholder, President and CEO of Rembrandt 3D Corp. ("Rembrandt – Delaware"), a Delaware corporation.

54.     Mr. Blumenthal's work with glasses free 3D technology goes back many decades and he founded 3DFusion and Rembrandt and Rembrandt-Delaware to pursue the technology.

55.     In 2007 Philips offered to 3DFusion a 3DTV Glasses-Free 3D Auto-Stereoscopic Display ("3DASD") solution known as the WOWvx Platform for displaying glasses free 3D content and converting and generating 3D content from two-dimensional (2D) media content for rendering on Philips's 3DASD monitors.  Philips invested 500 million dollars in the WOWvx Platform because it is PC driven using mathematical algorithms to add depth and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.  It is proprietary and exclusive to Philips via license access costing $100s of thousands annually.

56.     Philips licensed 23 other software 3D developers worldwide, of which 3DFusion was one of three in the U.S. 3DFusion invested in the complete Philips no glasses 3D WOWvx, 2D Plus Depth math based, digitally driven LCD platform, and licensed the WOWvx BlueBox Platform complete hardware, software and tools. (See Exhibit 13.)

57.      Only five other companies globally engaged the Philips technology developing

both hardware and software solutions.  3DFusion was the only Philips Licensee to engage optical partners like Corning Glass for lenticular lenses development, and Purdue University for advance LIDAR depth map image processing.

58.     The reason Philips invested over half a billion dollars in the technology and developed a complete A to Z workflow replacement for industrial, consumer, commercial, scientific and military video applications was because they knew that this digital algorithm technology would replace all 2D video imaging displays globally and would likely give birth to the first trillion-dollar enterprise.

59.      The Philips 3DSolutions corporate incubator's 3DASD solution suffered from significant image quality issues because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct.

60.     Through extensive experimentation and research comprising more than 3,000 hours of 2D-to-3D-depth-map, rendering and rotoscoping, Mr. Blumenthal developed a novel and non-obvious methodology to correct the image quality issues in the 3DASD content generated by the Philips WOWvx Platform.

61.     The 3DFusion technology discovery found that two of the Philips tools which they considered 'constants' could be used 'dynamically' to adjust and 'dial in the 3D image.'. Blumenthal discovered that they were in fact variables providing an 'adjustability' solution to the major artifact issues plaguing the Philips 2D Plus Depth platform.

62.     Blumenthal's patented 'adjustability' solution cured the flawed half a billion dollar Philips technology and made it a marketable product.  Due to the Eindhoven's team inability to correct these flaws, (now SCI's team, previously Stream's, originally 3DFusion's), Philips in 2009

shut down its 3DSolutions incubator, releasing the Eindhoven team, who 3DFusion immediately retained.

63.    Philips had solved all of the infrastructure issues of 3DASD commercialization, (except for Plaintiff's critical solution), so the segue from their R&D to consumer home, to all the scientific geo-spatially accurate, high value applications, is virtually seamless for all math based digital feed technologies, such as lidar, radar, MRI, x-ray to name a few. Consequently, the Philips WOWvx platform with Plaintiff's technology has virtually unlimited value, and the Defendants know it—that's why they have been fighting so fiercely to acquire control.  What is perplexing is that Statsney, SLS, Hawk and SCI sought to acquire control from entities which possess the technology but don't own it.

64.    While 3DFusion had shared some the innovations it developed in patents, many other improvements were held as trade secrets and were only disclosed and developed under non-disclosure agreements with other parties.

65.    Philips, as a global licensing high tech company, had developed massive security and ownership safeguards into the WOWvx platform so that without direct license access to the components of the technology, no outside researcher, university developer or hacker could gain access to the hardware and software needed to fix their broken machine.  Without these licensed tools from Philips, it was not possible to correct the flaws and create a marketable product.

66.    Neither Stream nor SCI had this license prior to 2011.  The 3DFusion patent filing and thus Rembrandt's technology provided the 'adjustability' key, whose essential foundation components, opened the door for all future advancements.   Philips disbanded the failed 3DSolutions Eindhoven team prior to Blumenthal's discovery, proving it had no knowledge of Blumenthal's discovery prior to meeting and working with him.

67.    At Blumenthal's Eindhoven team departure dinner, their senior graphic artist made a toast, stating, "It took a tv repair guy from upstate New York to come and show us how to fix our 3DTV. Thank you."  It was, amongst the Eindhoven team, an acknowledged fact that Blumenthal's "magic" had saved their 3DTV.

68.    In a November 10, 2010 email from Dr. Bart Barenbrug, the head software engineer for the Philips 3DSolutions Eindhoven team (for the 3DFusion team, for the Stream team and for the current SCI team,) stated the following in a correspondence with the 3DFusion C.E.O., Ilya Sorokin:

> *Ilya,*
>
> *I did download all of them this morning and afternoon (US time). I saw that in the ftp logs now, yesterday, but downloaded the proper one (if there's still time) or take an older version, if audio is needed (and it always help give more impact, imho). I made appropriate setting adjustments to maximize effects (Steve's magic). He's wizard at that for sure! and are ready to show them at the Bon Jovi event tomorrow.*
>
> *Great to hear that there was time. Have a great show, and we'll talk afterward, Bart.*
>
> *(Exhibit 14.)*

69.    The former Philips technical team, now the 3DFusion Eindhoven team, in January 2010, began working under the 3DFusion Dutch entity with Blumenthal for 15 months on 30 specific customer R&D projects developing and advancing Blumenthal's patented I.P.

70.    Mr. Blumenthal and 3DFusion developed trade secrets and filed for its own patents far before Mr. Blumenthal ever met the Rajans.

71.    The first of 3 provisional patents filing dates is December 2008.

72.    In 2009, after Philips had shut down its 3DSolutions incubator, 3DSolutions' senior management saw the 3DFusion solution.  Immediately the 3DSolutions senior management group took Blumenthal's solution to Philips' senior management, who immediately brought it to the

attention of Philips' licensing division I.P.& S., recommending that 3DFusion be given a full license to further develop the WOWvx platform.

73.     In April of 2010, after five months of negotiating with Philips Intellectual Property and Standards division, (I.P. & S.), 3DFusion signed the first Philips Technology license for their half a billion dollar investment in the 800 WOWvx, 2D Plus Depth patents, tools, SDKs, and sublicensing rights. (Exhibit 15.)

74.     The trade secrets reflect a wide range of improvements developed by Mr. Blumenthal and the 3DFusion team from 2007 to 2011.

75.     The 3DFusion Eindhoven team were required to sign NDAs for Philips I.P.& S. on behalf of the 3DFusion EU B.V. as noted in the 3DFusion company meeting minutes, and on behalf of 3DFusion USA.  It is clear that the Eindhoven team represented themselves as part of the 3DFusion team with the authority to bind 3DFusion and 3DFusion EU B.V. to contracts.

76.     Walther Roelen was hired as 3DFusion EU B.V. C.E.O. in May of 2010.

77.     Roelen's role as C.E.O. of 3DFusion EU, B.V. is verified by his bank account salaried payments, Dutch Corporate documents, his emails stating his C.E.O. status, his signed NDA, and his email confirming the 30 developmental projects in which he directed the team's activities during the 2010 15-month R&D cycle.

78.     Roelen was the primary individual to whom 3DFusion and the Eindhoven team looked to for leadership, guidance and to exercise his fiduciary responsibility to protect 3DFusion's IP and trade secret discoveries.  Roelen betrayed this trust and actively engaged in sabotaging 3DFusion EU's efforts by violating his ethical, technical, and fiduciary responsibilities.

79.     During this time, the team generated approximately 2,000 pages of emails, 1,000 pages of documents, and spent 1,000s of hours working on content and sharing ideas and

advancements.  No attempt is made herein to explain all facets of each development, but rather to provide a reasonable summary of the technology in question that was unique and proprietary to 3DFusion and now Rembrandt.

**MEETING THE RAJANS AND STREAM**

80.     In June of 2010, Mathu and Raja Rajan came to the 3DFusion NYC showroom to view the 3DFusion Philips 3DASD unit.  Upon seeing the demonstration, they immediately signed NDAs. (Exhibit 16.)

81.     At the time of this original June 9, 2010 NDA between Stream and 3D Fusion, (now owned by Rembrandt), Stream had no technology of its own.

82.     In June of 2010, all rights were held by 3D Fusion and therefore all improvements to that technology made after the June 9, 2010 NDA were owned by 3D Fusion.  The NDA clearly states that all derivative improvements are owned by 3DFusion. (Exhibit 16.)

83.      In June of 2010 the Rajans began negotiating a funding deal representing a 20-million-dollar US cable industry investor, Mr. Leo Hindery, Jr., who currently sits on the SCI Board.  The original Stream and 3DFusion term sheet was negotiated for several months and then signed on September 28, 2010 by the Rajans on behalf of Stream and as individuals. (Exhibit 17.)

84.     At that time all business plans, personnel, technology, trade secrets, key methods and assets were disclosed to the Rajans under Due Diligence guidelines in preparation for the December 2010 funding.

85.     As part of the September 28, 2010 Term Sheet Due Diligence transfer, Walther Roelen, the managing director and salaried head of 3DFusion's Dutch BV and the Director of the Eindhoven team, came in contact with the Rajans and betrayed his fiduciary duty and orchestrated the transfer of key 3DFusion assets and conveyed the Eindhoven team to Stream TV Network in

January of 2011.

86.     The Eindhoven team, having worked under Blumenthal's supervision and control for 15 months, had extensive knowledge of Blumenthal's innovations—both patented and protected as trade secrets for 3DFusion.  Eindhoven team employees, in violation of their NDAs and fiduciary duties, disclosed 3DFusion's technology, I.P. and trade secrets to Stream TV Networks, and later to SCI.

87.     The original technology developed by Blumenthal and 3DFusion was disclosed to the Eindhoven team after they were terminated from the Philips 3DSolution corporate incubator due to their failure to discover Blumenthal's solution, which is the basis for the Stream improvements over the old Philips technology.  These advancements are integrated into all the Stream technology and products and are embedded in the Ultra-D 3DTV's user friendly On-Screen Display to provide customer remote control adjustability to the 3D image, among other functions.

88.     These events and agreements were the basis for the Rembrandt lawsuit filed in January 2017 against Stream, Mathu Rajan, and Raja Rajan.

89.     3DFusion Corp. has since dissolved and all of its rights to intellectual property and technology have been assigned to Rembrandt.

**SDNY LITIGATION AND SETTLEMENT BACKGROUND**

90.     Plaintiff filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Networks, Inc., Mathu Rajan, and Raja Rajan.

91.     Defendants removed the state action to the United States District Court for the Southern District of New York.

92.     Rembrandt filed a first amended complaint. (Exhibit 1.)

93.     After Barenbrug and others filed declarations alleging that they had not signed non-disclosure agreements and Rembrandt responded with copies of the non-disclosure agreements, the case was referred for mediation.

94.     At the First Mediation Conference, held under Magistrate Judge Parker, Southern District of New York, on July 18, 2018, Plaintiff demonstrated its 3DASD original 3D technology using the original 3DFusion equipment that had been loaned to Stream in 2010.  Stream had falsely claimed in a February 2011 Philadelphia newspaper article that the technology was theirs, while the laptop and media player being photographed in the article was all Rembrandt or 3DFusion loaner equipment which they had refused to return. (Exhibit 18, Newspaper article.)

95.     After the First Mediation Conference, and for the following six months, the parties corresponded settlement terms via email and conducted several in-person settlement conferences at Stream offices in Philadelphia with Messrs.  Blumenthal, Michaels, and Wallace representing the Plaintiff, and Mr. Raja Rajan representing the Defendants.

96.     The parties exchanged various redlined proposals and Rembrandt continued to informally share additional evidence documenting the various trade secrets and prior communications between the Eindhoven team and 3DFusion, verifying the Rembrandt IP ownership. At no time did Stream present any evidence to the contrary.

97.     On January 11, 2019, more than six months after the First Mediation Conference, Magistrate Judge Parker ordered parties to attend a second settlement conference in person with counsel on April 9, 2019 (the "Second Mediation Conference").  The parties negotiated the various terms from the previously developed Redlined Term Sheet through Magistrate Parker.  Magistrate Parker had ordered that all parties with the authority to bind their respective companies attend the Second Mediation Conference in person with counsel on April 9, 2019. ("The Second Mediation

Conference".)    At this meeting the parties negotiated the various terms from the previously developed Redlined Term Sheet through Magistrate Parker.

98.    By late afternoon, after the parties reached mutual agreement to the various negotiated changes to the Redlined Term Sheet, Mr. Kronley, attorney for Stream, made hand-written agreed modifications thereto; the parties, with Stastney representing Stream and Mr. Blumenthal representing Rembrandt, then indicated assent by mutually initialing the modified Redlined Term Sheet; Magistrate Judge Parker then affixed her signature thereto (the "Settlement Term Sheet" attached as Exhibit 5).

99.    As part of these negotiations, a list of Rembrandt Trade Secrets was developed and included as an exhibit to the drafts of settlement term sheets, specifically, the parties had agreed that the following list of Rembrandt trade secrets were to be licensed to Stream as part of any settlement and were included in the Second Mediation Conference Settlement Agreement, Rembrandt, Stream, Mathu Rajan, and Raja Rajan via phone, attended the Second Mediation Conference in Magistrate Parker's chambers, reached an initial Settlement Term Sheet executed by Stream's CFO, Shadron Stastney (executing on behalf of Stream), on April 9, 2019, and signed by Magistrate Parker and the parties. Stastney is currently the CEO of SCI.

100.    The Settlement Term Sheet executed by Stastney did not modify the list of licensed trade secrets from prior drafts of the terms exchanged between counsel for the parties with the immediate draft prior to the settlement conference having been drafted by DLA Piper (counsel for Stream working with Stastney) and the revisions during the conference were all made by Mr. Kronley of DLA Piper, representing Stream and the Rajans.

101.    While it was clear in the mediation session, that Stastney understood that the Stream technology had been built on top of the technology of Philips, he confirmed this directly in this

deposition on June 27, 2023, when he testified:

> *The underlying technology was originally developed by Philips in the Netherlands starting in the early 2000s. [. . .] The team in the Netherlands wanted to continue to develop the technology and so they went looking for funding effectively to do so. Stream TV Networks had started doing other things, as you can tell by the name Stream TV Networks, none of which is really applicable to what they do now. And they were looking also for a new business line and determined that they would be able to raise money to provide a facility and working capital for the team in the Netherlands. [. . .] SLS is the one that provided the funding so that facility in the Netherlands could be set up and so that the initial license with Philips of the patent portfolio on which the technology is based could be obtained. (D.I. 303 in Case #23-10763 at 57:24-25; 58:3-11; 58:14-17.)*

102.    Stream had no technology of its own until Rembrandt's predecessor, 3D Fusion Corp., introduced Stream to the Eindhoven team and Stream licensed technology from Philips (Koninklijke Philips Electronics N.V., a Netherlands corporation).  The very reason for the original SLS investment was to obtain the license from Philips.

103.    Prior to the Rembrandt – Stream SDNY litigation, Stream reported a recent valuation at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).  By the time of the mediation with Stastney he reported that the share price has fallen to $1.50/share.

104.    By settling the IP dispute with Rembrandt and by adding significant volume to Stream's production to satisfy Rembrandt's orders, it was reasonable to believe that Stream's stock price would increase.  Therefore, Rembrandt negotiated for warrants in Stream with the hope and expectation that by working collectively and honoring Rembrandt's IP, the value of both companies would increase and Rembrandt would be rewarded with helping to create value for Stream's shareholders.

105.     Stastney provided the material financial information regarding the value of the shares in Stream, the relative changes to the share value before and after the Rembrandt litigation, the value of the at cost displays being offered to Rembrandt.  Stastney provided information about the expected profit margins that Rembrandt would be saving by purchasing displays at cost from Stream.  While the cash component of settlement was not trivial, it is clear that the $400/display x over 3,000,000 displays was the lion's share of the value offered by Stream for the license. (See Declaration of Christopher A. Michaels In Support of Rembrandt 3d Holding Ltd.'s Objection To Motion of William A. Homony In His Capacity As Chapter 11 Trustee For Entry Of An Order Approving A Settlement Agreement And Mutual Release With Hawk Investment Holdings, Ltd., As Collateral Agent For The Secured Noteholders Of Seecubic, Inc., Pursuant To Fed. R. Bankr. P. 9019(A) And 11 U.S.C. § 105(A) AT D.I. 628 Attached as Exhibit B)

106.     Through the mediation process, Stastney ascertained the value of Rembrandt's technology and agreed to tender a settlement and license payment. As compensation, Stream agreed to (i) pay Rembrandt $5,840,000 in cash; (ii) issue 2,000,000 warrants to purchase Stream stock; (iii) provide Rembrandt with 100 units of 4K-resolution glasses-free 3D televisions at no cost; (iv) provide Rembrandt with 8 units of 8K-resolution glasses-free 3D prototypes at no cost; and (v) grant Rembrandt the right to purchase 3,015,000 units of 8K-resolution mass-produced televisions at Stream's cost, for a total value of between $368,207,000 and $1,212,407,000.

107.     Eventually, Rembrandt, Stream, Mathu Rajan, and Raja Rajan fully executed a settlement agreement on May 23, 2021 that included the same list of Rembrandt trade secrets used in the previous Settlement Term Sheet.

108.     While capably represented by DLA Piper and under review and approval of Magistrate Parker, Rembrandt, Stream, Mathu Rajan, Raja Rajan, and Shadron Stastney all

approved of the list of trade secrets owned by Rembrandt and licensed to Stream.

109.    Every TV sold by Stream incorporated the know-how and trade secrets and, but for

the license, infringed the patents referenced in the term sheet, so this settlement was and is essential

for Stream (or any assignee or successor) to continue selling product free of infringement

allegations.

110.    Given that Stream's intent is to operate as a manufacturer, Rembrandt and Stream

designed a Non-Exclusive License which would support that strategy.  Therefore, Stream agreed

to pay Rembrandt $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs

for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD

units at cost. (Exhibit 2.)

111.    Rembrandt's SDNY case's final Settlement Agreement was signed by Rembrandt,

Stream, Mathu Rajan, and Raja Rajan on May 23, 2021 ending the dispute and acknowledging

Rembrandt's ownership rights to the technology and Stream's need for a license.

112.    In April of 2021, Rembrandt contacted Stastney, in his new role as CEO of SCI,

along with other secured lenders, creditors, and lenders of Stream.  However, Stastney refused to

have SCI obtain a license to Rembrandt's technology despite his personal knowledge that the use

of UltraD technology required a license to Rembrandt's IP and the Stream and Rembrandt

Settlement Agreement did not transfer any rights to SCI to absolve it of its trade secret

misappropriation and patent infringement.

113.    Despite having knowledge of Rembrandt's intellectual property rights and the trade

secret claims, neither Shadron Stastney nor SCI ever provided Rembrandt with notice of the

Omnibus Agreement or SCI's attempts to transfer Rembrandt's technology to its control.

114.     Rembrandt became aware of Stream's Chapter 11 bankruptcy proceeding from public notice. Through its counsel, Rembrandt sent an email to Stream's bankruptcy counsel (Exhibit 19), the counsel for creditors (Exhibit 20), and the counsel for SCI (Ex. 21) on April 20, 2021 to make sure they each knew about Rembrandt's ownership of the technology and to invite resolution.

115.     Rembrandt also joined with other creditors to pursue an involuntary bankruptcy petition for Stream and as part of its filings in support of the involuntary petition, Rembrandt filed declarations by Stephen Blumenthal (Exhibit 22) and Christopher Michaels (Exhibit 23).

116.     Just months after Rembrandt and Stream executed the Settlement Agreement, the Delaware Chancery Court issued a Partial Final Judgment that validated an agreement between Stream and its secured creditors (the "Omnibus Agreement") which transferred all of Stream's assets to SCI, a "newco" formed by the creditors.

117.     Stream appealed the Chancery Court ruling to the Delaware Supreme Court and on December 21, 2021, and on June 15, 2022, the Delaware Supreme Court issued a unanimous decision reversing and vacating the decision, rendering the Omnibus Agreement void ab initio, and remanding the case to the Chancery Court to unwind the transfer of Stream's assets. See Stream TV Networks, Inc. v. Seecubic, Inc., No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").  In holding that its corporate charter had been violated, the Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset

transfer] is consistent with our policy of seeking to promote stability and predictability in our corporate laws. . . ." Id. at pp. 53-54.

## REMBRANDT FILES SUIT AGAINST SCI, HAWK, AND TECHNOVATIVE IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE

118.   Rembrandt sent direct communications to counsel for both SCI, Hawk, and Stastney putting them on notice of Rembrandt's rights, yet all three continued to pursue attempts to take possession of and use Rembrandt's technology without a license.

119.   After using the invalidated Omnibus agreement to take control of Stream assets, SCI proceeded to destroy value of those assets by breaching both the Philips and Rembrandt license agreements, damaging production equipment, and promulgating a business plan based on infringing intellectual property and attempting to license out technology belonging to Philips and Rembrandt when both licenses specifically prohibited such sublicensing efforts thereby creating massive liabilities for infringement at Stream's subsidiary companies and specifically at Technovative.

120.   Upon learning of SCI's malfeasance and reviewing its website and attempts to license out Rembrandt's technology through its control of Technovative and subsidiaries of Technovative, Rembrandt filed a Complaint For Injunctive Relief And Misappropriation Of Trade Secrets (the "Delaware Complaint") in the United States District Court For The District Of Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and SeeCubic, Inc.("SCI"), and a true copy along with the exhibits was attached as Exhibit A to the Declaration re: of Christopher A. Michaels in Opposition of Hawk Emergency Motion for Relief from the Automatic Stay [ECF No. 69], which is incorporated herein by reference.

**THE DEBTORS FILE FOR CHAPTER 11 PROTECTION AND SEEK TURNOVER OF ESTATE ASSETS**

121.    On March 15, 2023, Stream and Technovative filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Despite Stream's Motion for Turnover on April 5, 2023 [ECF No. 76], assets possessed and/or controlled by SCI were not returned to the Debtors' estates.

122.    Not only did SCI refuse to return assets to the Debtors, it took action with Hawk in the Amsterdam Court of the Netherlands to unseat Stream's management as director of Stream's Dutch subsidiaries.

123.    The appointment gave Stastney control over Stream's patent portfolio as well as the R&D facility, engineers, and small-run manufacturing equipment.

124.    SCI and its CEO now have complete control over Stream's production equipment and all of the technology house in SCBV and the subsidiaries holding title to all of Stream's intellectual property and agreement with Philips.

125.    Stream does not have control over its assets and the Trustee has taken no action to provide Rembrandt or Rembrandt 3D Corp (Rembrandt-Delaware) with any information to assess the status of the technology held by Stream and its subsidiaries.

**REMBRANDT LEARNS SCBV INTENDS TO SELL PRODUCTS WITH REMBRANDT TECHNOLOGY**

126.    Stastney, Hawk, and SCI initiated legal proceedings in the Amsterdam Court and succeeded in installing Stastney as the interim director of the Debtors' three Dutch subsidiaries which own and control the Debtors' small-run manufacturing equipment, mass production optical bonding equipment, technology patent portfolio, research and development operations, computer source code, and other intellectual property.[1]

---

[1] Notably, the Dutch Court's order installing Stastney as director of SeeCubic, BV made it clear that the appointment was made "on an interim basis" pending direction and an order from a court of competent jurisdiction – which this

127.    The Dutch Court appointed an attorney from Jones Day, Mr. Berkenbosch, as an independent director.[2]

128.    Rembrandt was informed by the Debtors' counsel that SCBV was planning to work in concert with SCI to sell products outside of Stream and therefore SCBV would be in violation of Rembrandt's license that allowed SCBV to be in possession of Rembrandt's trade secrets.

129.    Rembrandt corresponded with Mr. Berkenbosch and other attorneys at Jones Day and Mr. Michaels final email to the attorneys at Jones Day on August 7, 2023 reads as follows:

> *Mr. Suurmond, Mr. Berkenbosch, and Mr. Shumaker:*
>
> *Over the course of my career I have had numerous positive interactions and have recommended your firm for IP litigation a number of times. Frankly, I am stunned by your lack of response and determination to actively misappropriate Rembrandt's technology in your role as director of Seecubic BV.*
>
> *While you have admittedly not reviewed our claims, other highly reputable firms have. Our settlement agreement and license with Stream was reviewed and prepared by Stream's attorneys, DLA Piper, at the direction of Shad Stastney. Shad signed the term sheet along with our client in front of a federal magistrate judge. Stream executed the final agreement on the same commercial terms and the agreement was reviewed by a number of law firms including Armstrong Teasdale, representing Stream. Further, the agreement has most recently been reviewed by Steam's counsel, Lewis Brisbois, prior to their choosing to accept or reject it as an executory contract in the bankruptcy. They reviewed our claims, and again decided a license was in the best interest of Stream..*
>
> *In view of the years of litigation that have preceded this situation, a settlement agreement reached, and all the officers and attorneys of the current corporate parent of Seecubic BV stating that a license from Rembrandt is necessary for Seecubic BV to proceed, it is extremely surprising to me that you would knowingly misappropriate Rembrandt's technology. Your actions are completely outside all of my prior experience with your firm. It is extremely difficult for me to believe that any of the numerous IP attorneys at Jones Day would recommend your course of action.*

---

Court certainly has the capacity to do upon the Trustee's motion.  See Amsterdam Court's Summary Judgment of September 20, 2023 (attached hereto as Exhibit 4).  Curiously, despite the indisputable value at SeeCubic, BV, the Trustee has made no motion to take control over these assets or to appoint himself or his deputy as director of SeeCubic, BV.

[2] See Amsterdam Court's Summary Judgment of June 29, 2023 (attached hereto as Exhibit.3).

*I have not heard from you in response to my email, but I was provided a copy of your emails with Stream's counsel and Ben Schladweiler provided copies of your email to Shad at the oral argument last week.*

*As I understand the current situation, you are proposing that you, and Jones Day, acting as a director will be the sole person to act and authorize the misappropriation and use of Rembrandt technology to fulfil contracts for commercial purposes to generate revenue for Seecubic BV. We have put you on notice or Rembrandt's trade secrets and you appear to be willfully engaging in use of Rembrandt's technology. To use your own words, "[You] have only been involved in the IP discussion since last week, it is very complicated, going on already for years, BV employees have a different view."*

*While it has been going on for years, it was settled some time ago with a settlement agreement and license valued at over $1.2 billion. Notably, the financial terms, IP ownership, and lack of right to sublicense were negotiated with Shad Stastney and later approved by Mathu Rajan. We all agreed that a license was necessary from Rembrandt for the UltraD system. In the case of Shad, his ascent was before Magistrate Parker. Now you are proposing the dramatic action of misappropriating the technology all over again at Seecubic BV. What possible basis/defense do you have for doing so?*

*While we are not sure of all of the employees at Seecubic BV that have had access to Rembrandt trade secrets, we do know that Dr. Bart Barenbrug had access to many documents, emails, and was on most group phone calls and helped 3DFusion deliver 30+ projects related to no glasses 3D displays and content. Have you or others at your firm reviewed those emails and documents that Dr. Barenbrug exchanged with my client? Have your evaluated whether the trade secrets and developments made at the time are included in the UltraD technology that you are authorizing to be supplied to third parties?*

*I am guessing that he has shared precisely zero documents. His zero documents will be compared to thousands of pages of evidence that I have sitting on our servers that I have reviewed. Those documents will be compared to the technology in UltraD. I have three massive binders with our work product and analysis of the misappropriation and infringement. We have shared pieces of that evidence in confidence to Stream's various counsels to get to settlement and acceptance of that settlement in the Stream plan. Each successive law firm looked at the information and recommended Stream enter the settlement agreement.*

*It is worth noting that DLA Piper started off strongly advocating that Stream did not need a license. They even filed a motion to dismiss with a declaration from Dr. Barenbrug that claimed among other things that he did not sing an NDA. When Rembrandt quickly provided evidence contradicting his testimony, we pressed DLA Piper attorneys on whether they knowingly suborned perjury by filing the false declarations. They told the judge that they wrote the declarations based on what they had been told by Dr. Barenbrug. We have provided Stream's*

*various counsel further evidence during mediations that led to the settlement agreement and inclusion in Stream's bankruptcy plan.*

*We are pursuing an injunction against Seecubic, Inc. the judge ruled that because a license was possible, monetary damages would suffice and that an independent director was appointed in the Netherlands. The value of the license is between $1.2-1.5 billion US. This is not a trivial value and no rationale company takes on a $1.2 billion obligation if they could avoid doing so. While I appreciate that you may not have had time to review the thousands of pages that Stephen Blumenthal and Bart Barenbrug shared many years ago, I don't think your failure to properly investigate the matter provides much cover from liability for Jones Day for our license fee if you knowingly engage in using Rembrandt technology without a license. I am not aware of any assets within Seecubic BV that would come close to covering this license fee, so Jones Day will be left paying the license fee.*

*I don't think there is any dispute Seecubic BV does not have a license from Rembrandt. As I understand your comments in your emails, you have not evaluated this situation other than to ask some Seecubic BV employees that are likely implicated in the misappropriation. I previously suggested that you consult with some of the numerous IP attorneys at Jones Day and that we set up a call to review the situation. Your firm is very well regarded for intellectual property work in the US. You have a very large number of attorneys with expert knowledge in trade secrets and patents. In addition, those experts can advise you on the liability of directors for misappropriation and infringement but I have attached an article on the topic: (chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.wsgr.com/PDFSearch/IP_RESPONSIBILTY.pdf)*

*I am guessing you are being encouraged by employees at Seecubic BV and/or Seecubic, Inc to take such actions. You and Jones Day will be liable for the damages of your misappropriation. Have you asked Shadron Stastney, Bob Morton, Bart Barenbrug, Seecubic, Hawk, SLS or any person/entity that is encouraging you to take such action to indemnify you and Jones Day if it turns out Rembrandt's claims are valid? You and Jones Day are taking on immense liability at the encouragement of people that are showing up in court and arguing that it isn't them conducting the misappropriation but rather the director in the Netherlands and the judge even noted it his decision. SLS/Seecubic and Hawk have filed claims in excess of $175,000,000 in the Stream bankruptcy. Have you asked them to pledge those assets to cover liability to Jones Day if they are wrong in what they are encouraging your firm to do? While those assets are a small fraction of the license fee Jones Day will owe, at least you will find out in a hurry just how confident they are in their position when asked to take a small fraction of the risk Jones Day is taking on by your actions as director.*

*To be clear, I am hereby putting you personally and Jones Day on notice of Rembrandt's claim and that use of Rembrandt technology will trigger at a*

*minimum the value of the license with Stream. This amount was calculated based on representations made by Shadron Stastney to Rembrandt while he was the CFO at Stream that the profit margin on Stream TVs would be $400/unit, but Mathu Rajan testified that he expects profit margins to be $500/unit, which would potentially make Rembrandt's claim even higher such that the value of the license is $1.2-1.5 billion. The judge felt there was no imminent harm because a monetary license was possible, but I pointed out the there is no way Seecubic BV could pay the license fee. The judge has pointed to the independent director. Our license fee is roughly ½ of your firm's annual revenue and Seecubic, BV has almost no assets or revenue, so as a practical matter your firm is the only entity that can afford to pay the license fee.*

*In addition, I am requesting your cooperation prior to adding Jones Day to any pending litigation for the following pre-litigation investigation:*

*1. Please clarify if Jones Day has authorized delivery of any prototype, content, display, or other implementation of UltraD technology after my email to you;*

*2. Please identify the employees at Seecubic BV that you were referring to as having a different view in your email; and*

*3. If you provided such authorization, please identify any opinions of counsel you relied upon in providing such authorization.*

*We are also considering petitioning for a FRCP Rule 27 pre-litigation deposition of Jones Day, we are making this request prior to fi ling a petition or adding Jones Day, and/or other Seecubic BV employees to the pending Delaware action or toa new action in the Southern District of New York where the original litigation was filed in hopes that you will facilitate our investigation.*

*I still remain hopeful that a discussion with a US based IP attorney at Jones Day will help us resolve this issue. I remain ready to participate in a conference call.*

*Chris*

130.    After receiving Rembrandt's email, the independent director resigned on August 9, 2023.[3]

131.    While Rembrandt hoped that the resignation of the independent director would stop SCI's and SCBV's continued efforts to interfere with the Rembrandt license to Stream the attempted misappropriation continued.

---

[3] See Translation of Summary Judgement Decision in Amsterdam Court dated September 20, 2023 at paragraph 2.26 attached as Exhibit 4.

**A TEMPORARY RESTRAINING ORDER WAS ISSUED BY THE BANKRUPTCY COURT TO PROTECT BOTH THE DEBTORS AND THEIR THIRD-PARTY LICENSORS, INCLUDING REMBRANDT, FROM INFRINGEMENT.**

132.    On September 30, 2023, ten days after Stastney staged his coup to seize operational control of the Debtors' Netherlands subsidiaries, Stream filed a motion seeking injunctive relief[4] to prevent SCI, SLS, Hawk, and SCBV (at the direction of Stastney) from using the Debtors' technology to compete with the Debtors.

133.    On October 2, 2023, Rembrandt filed a memorandum in support of the Debtors' request for a TRO[5], citing Stastney's newly regained control of SCBV as a prelude to anticipated violations of the Rembrandt IP by Stastney, SCI, SLS and Hawk in continuance of the actions they had taken while the 225 Action was being litigated.

134.    On information and belief, with operational control of Stream's technology under his control overseas, Stastney used, and continues to use, SCBV as SCI's own technology development entity.  SCI commissioned the creation of technology demonstrator samples for use in developing customer relationships beneficial to SCI, not to the Debtors' estates. Stastney, SCI, SCBV, and those working in concert with them were once again using Rembrandt technology without a license, far from the Bankruptcy Court and under the protection of the Amsterdam Court which waited for a definitive ruling from an American court.

135.    Even worse, SCI promoted, and continues to promote, a sublicensing business model to potential customers, putting both of the Debtors' critical third-party technology licenses (from Rembrandt and Philips) in jeopardy because neither license is transferable and neither permits sublicensing.

---

[4] Adversary Case No. 23-00057, Docket No. 29
[5] Adversary Case No. 23-00057, Docket No. 32

136.    From October 6, 2023 through November 27, 2023, the Bankruptcy Court held hearings on Stream's motion for injunctive relief, and on January 4, 2023, it issued a Temporary Restraining Order against Stastney, SCI, SLS, Hawk, SCBV, and others (the "TRO")[6].

**THE TRUSTEE ALLOWED THE DEFENDANTS TO VIOLATE THE TRO.**

137.    Despite this Court's issuance of the TRO, Stastney, SCI, SLS, Hawk, SCBV, and others working in concert with them continued to use the Debtors' technology (and therefore, the Rembrandt IP) for their own benefit, and to the detriment of the Debtors and other parties in interest.  Upon information and belief, SCI has used and continues to attempt use the Rembrandt's intellectual property to raise capital necessary to fulfill its obligations under the 363 sale.

138.    On May 6, 2024, Rembrandt notified counsel for SCI and Hawk that it had become aware of a planned May 7, 2024 meeting to be held by their clients in violation of the TRO. Counsel for SCI failed to acknowledge Rembrandt's email at all.  Hawk's counsel eventually responded, but only two days after the alleged meeting had occurred.  Hawk's counsel stated:

> It is up to the Debtors to determine whether they believe a violation occurred or needs to be addressed. The Debtors have not taken any action or voiced any concerns. The e-mails also suggest Rembrandt believes its technology may have been improperly used. But there is no pending motion or order defining or dealing with the use of Rembrandt's technology.

139.    The position of Hawk's counsel is untenable because the TRO specifically references the Rembrandt technology and prohibits the Enjoined Parties from:

> Tak[ing] any action to sublicense, transfer, assign, or otherwise dispose of **or affect** any license or technology held or purported to be held by the Debtors' estates, including but not limited to the Ultra- D technology, and the Philips or Rembrandt licenses. (TRO ¶ 9(a), emphasis added)

---

[6] Adversary Case No. 23-00057, Docket No. 119

140.    The Defendants were all clearly covered by the Court's TRO.  Unauthorized use and/or distribution of its technology does indeed affect the value of its license.  Misappropriation of trade secrets constitutes irreparable harm.

141.    Stastney circulated a memorandum in late September on behalf of SCI to investors and other stakeholders.  The email touted "28 projects across 25 customers" who were all engaged in proof-of-concept stages of negotiations with SCI and SCBV, which is under Stastney's control as sole director.  As stated above, only Stream possessed a license from Rembrandt.  None of Stream's subsidiaries, including Technovative, were entitled to use the Rembrandt IP *unless it is for the benefit of Stream*.  Stastney's email clearly indicated that these many projects were for the benefit of SCI, which was seeking investment to support its growing business.

142.    As indicated in the September 2024 Monthly Operating Report filed by the Trustee, a royalty payment was made to Philips pursuant to the Philips license agreement.  This confirms that the Debtors' subsidiaries, under the direction of Stastney, have sold products containing the Debtors' technology, the Philips technology, and thus, the Rembrandt technology.

143.    The UltraD technology is a combination of technology owned by Koninklijke Philips Electronics ("**Philips**"), Rembrandt, and Stream (and its subsidiaries), and that once that technology package is broken, the Debtors cannot fix it later.  (See testimony of Christopher Michaels at the hearing on September 22, 2023 at pages 38 and 39; "*I think the primary issue that we will all benefit from in this proceeding is to accurately understand what Stream needs in order to have a going concern value and to create the most value in the bankruptcy estate. The concept of taking a portfolio of technology developed partly at Philips, partly at Rembrandt, partly at Stream, and then starting to carve it up and sell it off piecemeal is like taking a Ferrari and deciding to go at it with a blowtorch and start trying to cut out the engine that is Philips, and the*

*transmission that was Rembrandt, and saying hey, we got this pretty red car, right?  Pay me $250,000 for it and you've probably got $200 worth of scrap metal. That's what's about to happen. This company has value in the technology portfolio that it has created. The licenses from Philips and Rembrandt connected with their own technology that is worth far more collectively in its whole than any of the individual parts. And it's not even clear that you could put the parts back together. Somebody would have to go reacquire a license from Philips, a license, you know, the technology rights to Stream, and a license from Rembrandt. And we don't have to give that license. I mean, we can decide whether, you know, we may have our own desires and needs at that point and we wouldn't have to grant that license, which would effectively render the technology worthless. A Chapter 7 sale of assets, the only bidder, I mean, that would have the right to come in and buy these assets is Rembrandt. I mean, good for us, but not likely to create much value in the bankruptcy estate. I mean, we would be the only one to walk 1 away with clear technology rights going forward.*")

144.    Judge Coleman found that "*the Debtors have shown that there is risk of immediate irreparable injury to Stream's alleged intellectual property in the form of possible permanent loss of Stream's rights in the Philips and Rembrandt licenses.*" (D.I. 119 at page 5)

145.    "The TRO specifically protected Rembrandt's intellectual property and license to Stream as follows: "*No Defendant shall, prior to the conclusion of the Final Hearing, take any action to sublicense, transfer, assign, or otherwise dispose of or affect any license or technology held or purported to be held by the Debtors' estates, including but not limited to the UltraD technology, and the Philips or Rembrandt licenses.*" (D.I. 119 at page 6)

146.    During the hearing before the court on November 17, 2024, Rembrandt raised the issue that it believed SCI had demonstrated a display that is an asset of Stream including

Rembrandt technology to the Trustee. However, Ms. Brumee representing, SCI, stood and reported that in actuality "*The demo units were developed and built by SeeCubic B.V. in the Netherlands, which is five entities down in the corporate structure. Any demo unit that has been produced and especially that one that Mr. Homony has seen would be from SeeCubic B.V.*" (Transcript from November 17, 2024 hearing at page 45)

147.    Both SCI. and SCBV are Defendants covered by the protective order and Ms. Brumee confirmed that those two Defendants flagrantly violated the temporary restraining order by delivering demos using both Philips and Rembrandt technology violating both the Rembrandt and Philips licenses.

148.    Neither SCI or SCBV have a license from Rembrandt or Philips.  In both cases it is the parents of SCBV that hold a license that allows SCBV to manufacture product and use the licensed technology make TVs for the license holder (Stream).

149.    SCI does not have a license from Rembrandt and SCBV's use of Rembrandt intellectual property to provide demo units to any entity other than Stream is an interference of Rembrandt's license to Stream.

150.    SCI and SCBV are under the direction of Stastney and are using Rembrandt's IP in support of an effort to acquire the property as well as to market the assets, including Rembrandt's technology, in an effort to commercialize the technology.  This conduct violates the TRO issued by this Court and injures both Rembrandt and the Debtors.

151.    Stastney, SLS, Hawk, SCI, and SCBV do not own any technology related to no glasses 3D TV outside of the technology provided by the Debtors, Rembrandt, and Philips. They have no authority to demonstrate it or misrepresent their ownership.

152.    Despite the TRO, SCI continued to act as their acquisition was assured and that they had the right to all the underlying technology, including Rembrandt's and Philip's intellectual property.  Of course, Rembrandt's technology was specifically excluded from the 363 sale and the Philips Agreement terminates upon change of control (See Sections 1.9 and 5.4(d) of the Philips license.

153.    To terminate the Philips license, any source code, know-how, or software prior to must be removed from the Ultra-D technology and Ultra-D Ventures must make a specific showing to Philips that the full license has been paid and the products proposed by Ultra-D do not infringe any of their patents that are still in force (see section 5.5 (d) of the Philips license).

154.    Until the Philips software has been removed from the Ultra-D code and the showing with respect to the roughly 1,500 Philips patents has been made, it is not possible to ascertain what if any of the Ultra-D technology can be sold.

155.    Likewise, Rembrandt's technology needs to be removed from the technology in the possession of SCBV at the time of the 363 sale.

156.    Removal of licensed intellectual property at the termination of a license is standard practice in the industry, but SCBV has not removed Rembrandt's technology and has colluded with Stastney, SLS, Hawk, and SCI to gain the value of Rembrandt's technology without compensation to Rembrandt and has knowingly misappropriated Rembrandt's trade secrets.

157.    Basically, the Defendants want the value of the combined Philips, Rembrandt, and Stream technology but the Debtors do not own the Philips and Rembrandt technology and transferring the Philips and Rembrandt technology violates both agreements.

158.    Interfering with the Philips and Rembrandt agreements was specifically prohibited by the TRO, but that is precisely what the Defendants did, which not only damages Rembrandt but

shows a disdain for the authority of the courts.

159.    While SCI has been offering Rembrandt's patented invention to others for sale and claims that the products were made by SCBV for its use, this argument means that the estate would have to cover the full payment of the arrears and on-going license fees which add up to over $3,000,000 (11 U.S. Code § 365(b)(1)(A) for use of the license through the date of rejection of the license.    Any offer for sale of Rembrandt's patented inventions would constitute patent infringement.[7]   While Rembrandt put the Trustee and all the Defendants on notice that its intellectual property was included in the assets being sold under the 363 sale and the sale order specifically excluded those assets from the 363 sale, none of the Defendants took any steps to remove Rembrandt's intellectual property from the assets and sold assets covered by Rembrandt's patents and transferred possession of Rembrandt's trade secrets anyway.

160.    "Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.    Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice..." Voice Sys. and Servs., Inc. v. VMX, Inc., citing 28 U.S.C. § 959(a)   The court granted a preliminary injunction that prevented the debtor from continuing the alleged infringement.[8]

---

[7] 35 U.S.C. § 271(a) provides that "whoever without authority makes, uses, **offers to sell,** or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent…" (emphasis added).

[8] "None of this implies that debtors in bankruptcy may violate federal law with impunity, selling patented products or, say, going into the cocaine distribution business. Cf. Douglas G. Baird, The Elements of Bankruptcy 194-98 (1992). Damages for wrongs done during the bankruptcy proceeding are administrative claims, and thus paid in full most of the time. The bankruptcy judge may enjoin ongoing wrongs, or release the automatic stay to allow another court to consider claims that debtors are violating the law." In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 140 B.R. 969, 977 (N.D. Ill. 1992) (Judge Easterbrook sitting by designation); see also Lancaster Composite, Inc. v. Hardcore Composites Operations, LLC, No. Civ. 04-1414-SLR, 2005 WL 121794, at *977 (D. Del. Jan. 14, 2005)

161.    Rembrandt's claims of infringement against the estate for the alleged infringement would likely render the estate administratively insolvent.

**THE TRUSTEE SOLD ASSETS THAT THE DEBTORS DO NOT OWN**

162.    SCBV, as a wholly owned subsidiary of Stream and Technovative, previously and currently employs Bart Barenbrug.  Dr. Barenbrug had access to Rembrandt intellectual property that was eventually licensed to Stream (See List of Trade Secrets attached to Declaration of Stephen Blumenthal attached as Exhibit 27).

163.    Rembrandt has cited precise documents where the trade secrets were shared with Dr. Barenbrug.  Stephen Blumenthal's declaration and Rembrandt various pleadings have provided overwhelming and incontrovertible evidence that the UltraD technology and all of Stream's products to date include Rembrandt's technology.

164.    The Rembrandt license granted to Stream states: "Either Party may sub-license their rights to other parties for the purpose of having products distributed by the Party." No other sub-licensing is permitted. (See Exhibit 6 to Declaration of Stephen Blumenthal attached as Exhibit A at ¶ 14.)  Nothing in the license allows SCBV to make products for any entity other than Stream.

165.    The Trustee transferred the Stream technology – which includes Rembrandt's intellectual property and trade secrets as repeatedly acknowledged by the Debtors and documented in both the Settlement Term Sheet and the Settlement Agreement – through the 363 Sale without an assignment of the Stream license from Rembrandt or issuance of a new, direct license from Rembrandt.  The Trustee could not sell what the Debtor does not own and the Rembrandt intellectual property and any physical assets that included Rembrandt intellectual property were excluded from the sale, however, possession of those assets was transferred anyway.

166.    If the Defendants are allowed continued access to Rembrandt's trade secrets, the harm to Rembrandt will be (1) the destruction of its trade secrets, and (2) the unauthorized use of said trade secrets and the patented technology without a license by SCI.  The damage to Rembrandt will be irreparable and immediate and will cut off Rembrandt's ability to negotiate its own licenses and to control the specifications of glasses 3D products entering the marketplace.  These damages cannot be fully addressed by monetary relief.

**VALUE OF REMBRANDT INTELLECTUAL PROPERTY**

167.    While negotiating the relative value of a fair settlement between Rembrandt and Stream, both parties referenced the cost of obtaining a non-exclusive license to the underlying Philips technology and the cash component of the license was set at a similar value.

168.    Notably, the Philips technology was seriously flawed until Mr. Blumenthal applied his technical improvements. Indeed, Rembrandt had previous versions of the old Philips 3D sets and had provided demonstrations of how the Philips technology looked without Rembrandt's technical improvements and the knowhow and trade secrets licensed to Stream.

169.    SCI, SLS, and Hawk are seeking to take Rembrandt's technology without similar compensation for the license—indeed, SCI has already claimed to own the technology despite the fact that Rembrandt has only licensed the patents and trade secrets comprising the no glasses 3D technology.  The harm to Rembrandt is (1) the destruction of its trade secrets, and (2) the use of said trade secrets and the patented technology without a license by SCI, SLS, and Hawk.

170.    Rembrandt is free to license others and seek similar licenses.  However robust SCI has become, they are not nearly as capable of a partner as Sony, Sharp, Samsung, LG, or any of the major LCD manufactures such that the value that Rembrandt could expect from licensing its technology to other vendors is much higher.

171.    Further, Rembrandt is actively seeking products for its own use, design collaborations to seek its own specification for particular and specialized applications.

172.    If SCBV, SLS, Hawk, or SCI are allowed to transfer Rembrandt's intellectual property without a license from Rembrandt to other vendors, the damage to Rembrandt will be irreparable and immediate.  Such a transfer will cut off Rembrandt's ability to negotiate its own licenses and to control the specifications of glasses 3D products entering the marketplace.  These damages cannot be fully addressed by monetary relief.

**REMBRANDT'S CAUSES OF ACTION**

**COUNT I -Injunction and Order**

173.    Rembrandt incorporates by reference and realleges the preceding paragraphs 1 through 172 as if fully set forth herein.

174.    18 U.S. Code § 1832 a) states that attempted or actual misappropriation constitute theft of trade secrets. 18 U.S. Code § 1836(3)(A) provides for an owner of a trade secret to seek an appropriate injunction to prevent harm and loss of the trade secret.

175.    SCBV is not authorized to use Plaintiff's technology and does not have a license to use Plaintiff's know how, trade secrets or patents other than when making products for Stream.

176.    The Defendants actively and knowingly colluded to acquire SCBV that included possession of Rembrandt's trade secrets through the 363 sale without removing the Rembrandt trade secrets.

177.    Rembrandt has notified the Defendants on numerous occasions of its rights and the provided detailed evidence of the trade secrets that are included in displays the Trustee was shown by representatives of Stastney, SCBV, SCI, SLS, and Hawk.

178.    The Defendants should be ordered to remove the Rembrandt intellectual property

from the assets sold in the 363 sale and enjoined from further use o and attempts to sell Rembrandt's property.

179.    Rembrandt is entitled to receive the value of its license from Stream under section 10 of the Settlement Agreement (Exhibit 2).  The license to Rembrandt cannot be terminated due to the protections of 11 U.S. Code § 365(n).

180.    Transferring Rembrandt's intellectual property or failing to deliver the licensed intellectual property to Rembrandt would cause irreparable harm to Rembrandt as the dissemination of the trade secrets could never be contained or licensed and failure to provide the licensed intellectual property would violate 11 U.S. Code § 365(n).

181.    The Defendants should be ordered to deliver to Rembrandt all material related to UltraD that is relevant for the license granted to Rembrandt, specifically, source code, designs, documents, and other know-how to fulfill Stream's obligations and license to Rembrandt pursuant to and the grant of rights from Stream to Rembrandt under section 10 of the Settlement Agreement (Exhibit 2)

182.    In Hawk's settlement with the Trustee, the agreement requires an asset sale, but notably does not require a transfer of any assets belonging to Philips or Rembrandt.

183.    The Trustee is only required to transfer assets belonging to the Debtors.

184.    The Trustee will not violate the existing agreement with Hawk by removing the Rembrandt intellectual property prior to the sale as the asset purchase agreement does not require that Rembrandt intellectual property will be included.  In fact, the Stalking Horse Purchase Agreement includes a broad disclaimer that assets are "being sold on an "as is/where is" basis with no warranty or guaranty of possession..." Ultimately, there is no guarantee that any asset will actually be delivered to the buyer. (see D.I. 810 at page 3 in case #23-10763).

185.    In the list of assets (See D.I. 810 in case #23-10763), the Trustee has not listed any specific source code or functions of the software and firmware, so removal of any and all Rembrandt technology will fully meet the description of assets under the Sale Order.

186.    The requested injunction preserves the Sale Order only AFTER removing all of the Rembrandt intellectual property.

187.    The misappropriation and breach of contract can be remedied and further harm prevented only if Rembrandt's 3D No Glasses Technology does not leave SCBV and is returned to Rembrandt.

188.    The sale of Rembrandt's assets would cause irreparable harm for which money damages would not adequately compensate Rembrandt.  Rembrandt is therefore entitled to an injunction and order to prevent Defendants from receiving, buying, possessing, taking, carrying away, concealing, obtaining, copying, duplicating, sketching, drawing, photographing, downloading, uploading, altering, destroying, photocopying, replicating, transmitting, delivering, sending, mailing, communicating, or conveying Rembrandt's trade secrets.

## COUNT II - Actual Damages

189.    Rembrandt incorporates by reference and realleges the preceding paragraphs 1 through 188 as if fully set forth herein.

190.    18 U.S. Code § 1836(3)(B) provides for an owner of a trade secret to actual damages from the harm and loss of the trade secret.

191.    SCI brazenly markets Rembrandt's Technology as its own: "SeeCubic is currently focused on working together with top-tier home and mobile device brands via strategic partnerships to deliver spectacular viewing experiences to all consumers.  We are bringing our

technology to all popular device types we all use on a daily basis –televisions, mobile devices, computer screens, and even in-car displays." (Exhibit 24.)

192.    Upon information and belief, SCI has been using Rembrandt's trade secrets for the purpose of advancing development of glasses-free 3D displays which constitutes a willing disclosure and misappropriation of Rembrandt's trade secrets by SCI.

193.    SCI is managed by Shadron Stastney.  Stastney negotiated the license that Stream obtained to utilize the technology.  Stastney had actual knowledge of the misappropriation because he knew that Plaintiff owned the technology and that Stream needed a license to possess and utilize it.  Nevertheless, Stastney has acted without a license.  Additionally, Stastney, SCI, SLS and Hawk were all apprised of Rembrandt's rights in an email from its attorney, Chris Michaels, Esq. on April 20, 2022. (Emails attached as Exhibits 25 & 26.)

194.    The Defendants do not have a license to utilize Plaintiff's technology and their actual misappropriation has damaged Plaintiff.  Under no circumstance does SCI's control of Technovative or SCBV provide SCI with ownership of Rembrandt's technology and the Sale Order specifically excluded  Rembrandt's license to Stream, the Rembrandt technology, and any physical asset that included Rembrandt's, yet Defendants have misappropriated Rembrandt's technology.

195.    Upon information and belief the Defendants' attempt to share Rembrandt's trade secrets will result in the destruction of the trade secrets, and will cause significant harm to Rembrandt.

196.    Upon information and belief the Defendants are aware that Rembrandt owns its technology, that the technology is licensed to Stream, and that removing Rembrandt's technology

from Stream without a license from Rembrandt would both cause Stream to breach its license with Rembrandt and would be a misappropriation of Rembrandt's trade secrets.

197.    The Defendants are not authorized to use Rembrandt's technology and do not have a license to use Rembrandt's knowhow, trade secrets, or patents.

198.    SCI's entire business model is to license the UltraD technology, including Rembrandt and Philips intellectual property, to others in direct violation of the clear language of both the Rembrandt and Philips agreements, but is very familiar with the value of a license to Rembrandt's trade secrets and patents as Stastney negotiated the terms of the Stream Rembrandt Settlement Agreement (Exhibit 2).  At a minimum, Defendants should be ordered to pay damages that are equivalent in value to this agreement negotiated by Stastney.

199.    Despite this actual notice of Rembrandt's rights, the Defendants have pursued actions to transfer control of Rembrandt's technology outside of Stream to their own control and use.

200.    Rembrandt is entitled to damages for the theft of trade secrets that the Defendants have attempted and actually consummated.

## COUNT XXXIII -Willful Damages

201.    Rembrandt incorporates by reference and realleges the preceding paragraphs 1 through 200 as if fully set forth herein.

202.    18 U.S. Code §1836(3)(C) states that if "the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B)" may be awarded.

203.    The Defendants do not have a license to utilize Plaintiff's technology and their actual misappropriation has damaged Plaintiff.  Under no circumstance does SCI's control of

Technovative or SCBV provide SCI with ownership of Rembrandt's technology and the Sale Order specifically excluded  Rembrandt's license to Stream, the Rembrandt technology, and any physical asset that included Rembrandt's, yet Defendants have misappropriated Rembrandt's technology.

204.    Upon information and belief the Defendants' attempts to share Rembrandt's trade secrets will result in the destruction of the trade secrets, and will cause significant harm to Rembrandt.

205.    Upon information and belief the Defendants are aware that Rembrandt owns its technology, that the technology is licensed to Stream, and that removing Rembrandt's technology from Stream without a license from Rembrandt would both cause Stream to breach its license with Rembrandt and would be a misappropriation of Rembrandt's trade secrets.

206.    The Defendants are not authorized to use Rembrandt's technology and do not have a license to use Rembrandt's knowhow, trade secrets, or patents.

207.    SCI's entire business model is to license the UltraD technology, including Rembrandt and Philips intellectual property, to others in direct violation of the clear language of both the Rembrandt and Philips agreements.

208.    Despite this actual notice of Rembrandt's rights, the Defendants have pursued actions to transfer control of Rembrandt's technology outside of Stream to their own control and use.

209.    Rembrandt is entitled to exemplary damages under 18 U.S. Code §1836(3)(C) because the Defendants willfully and maliciously misappropriated Rembrandt's trade secrets.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, the Plaintiff respectfully requests that the Court

issue an order that includes:

a.  An adjudication that Defendants have misappropriated Plaintiff's trade secrets;

b.  An adjudication that Rembrandt's property was embedded in the Debtors' Assets sold

in the 363 sale, but have not been removed by the Defendants;

c.  An award of an injunction to require that the Defendants remove and return all of

Rembrandt's trade secrets from all source code and servers pursuant to 18 U.S. Code §

1836(b)(3)(A) ;

d.  An award of damages for the misappropriation of trade secrets pursuant to 18 U.S.

Code § 1836(b)(3)(B);

e.  An award of exemplary damages for the misappropriation of trade secrets pursuant to

18 U.S. Code § 1836(b)(3)(C) ;

f.  An adjudication that this case is exceptional and an award of Rembrandt's reasonable

attorneys' fees;

g.   An order that the Defendants transfer source code, designs, documents, and other

know-how to fulfill Stream's obligations and license to Rembrandt pursuant to 11 U.S.

Code § 365(n) and the grant of rights from Stream to Rembrandt under section 10 of

the Settlement Agreement (Exhibit 2); and .

h.  Granting such other and further relief as this Court may deem just, equitable or

appropriate under the circumstances.

Dated November 14, 2025                Respectfully submitted,

DEVIN LAW FIRM LLC

By: */s/ Andrew DeMarco*
        Andrew DeMarco, Esq.
        1526 Gilpin Avenue
        Wilmington, DE 19806
        Telephone: (302) 449-9010
        Facsimile: (302) 353-4251
        ademarco@devlinlawfirm.com

        -and

        BROWN & MICHAELS, P.C.
        Christopher A. Michaels, Esq.
        7560 Commons Blvd. #1021
        Victor, NY  14564
        Telephone: (607) 256-2000
        michaels@bpmlegal.com

*Attorneys for Plaintiff Rembrandt 3D Holding Ltd.*